**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**
**Case No. 1:20-cv-00242-MOC-WCM**

| | |
|---|---|
| **DONNA S. SHOOK,** as Executrix of the )<br>**ESTATE OF JEAN S. SATTERFIELD** a/k/a )<br>**JEAN S. PENLAND**, )<br>                                                   )<br>        Plaintiff, )<br>                                                   )<br>vs. )<br>                                                   )<br>**BOSTON SCIENTIFIC CORPORATION**, )<br>                                                   )<br>        Defendant. )<br>_____) | **AMENDED COMPLAINT**<br>Wrongful Death<br>Negligence<br>Breach of Implied Warranties<br>Product Liability<br>(Jury Trial Requested) |

Now Comes Plaintiff, Donna S. Shook, as Executrix of the Estate of Jean S. Satterfield a/k/a Jean S. Penland, and pursuant to leave granted by Order of the Court on December 11, 2020, files this Amended Complaint.

Plaintiff, Donna S. Shook, as Executrix of the Estate of Jean S. Satterfield a/k/a Jean S. Penland, complaining of the Defendant, Boston Scientific Corporation, alleges and says as follows:

## JURISDICTION AND PARTIES

1.  Jean S. Satterfield a/k/a Jean S. Penland (hereinafter "Ms. Penland") was born on November 9, 1932. She died on July 29, 2018, from injuries sustained on February 15, 2018, during a surgical procedure to place a Watchman™ medical device manufactured by Boston Scientific Corporation. At the time of Ms. Penland's death, she resided in Candler, Buncombe County, North Carolina. She was survived by two daughters, two grandchildren, two sisters, and one brother.

2.  Donna S. Shook (hereinafter "Ms. Shook") is a citizen and resident of Marion, McDowell County, North Carolina. Ms. Shook is Ms. Penland's daughter and the Executrix of her Estate having qualified and been appointed as such by the Clerk of Superior Court for Buncombe County, North Carolina on September 16, 2019. By virtue of said appointment, Ms. Shook has the capacity and authority to bring this action for wrongful death on behalf of the Estate of Jean S.

Satterfield a/k/a Jean S. Penland pursuant to N.C.G.S. §28A-18-1. Ms. Shook is further entitled to bring this action for Breach of Implied Warranty pursuant to N.C. Gen. Stat. §99B-2.

3. Boston Scientific Corporation (hereinafter "Boston Scientific" or "Defendant") is a for profit corporation incorporated in the state of Delaware and is authorized to do business and does business in Asheville, Buncombe County, North Carolina and throughout the state of North Carolina.

4. At all times relevant to this action, Boston Scientific was engaged in the business of researching, designing, formulating, fabricating, compounding, testing, manufacturing, constructing, producing, assembling, inspecting, distributing, labeling, promoting, packaging, preparing, advertising for sale, and selling medical devices, including a left atrial appendage closure device and delivery system known as Watchman™.

5. On February 15, 2018, Ms. Penland underwent a surgical procedure at Mission Hospital in Asheville, Buncombe County, North Carolina wherein her Cardiologist, Dr. John Rhyner ("Dr. Rhyner"), attempted to implant a 27 mm Watchman™, Catalog No. M635WU27060; Lot No. 21428671 (hereinafter Penland Watchman™).

6. The Penland Watchman™ was designed, formulated, fabricated, compounded, tested, manufactured, constructed, produced, assembled, inspected, distributed, labeled, packaged, prepared, and sold by Boston Scientific.

7. The Penland Watchman™ was surgically delivered to the left atrium of Ms. Penland's heart and deployed by Dr. Rhyner with appropriate surgical technique, in a customary, usual, and reasonably foreseeable manner, and in the same condition as when it left the Defendant's control.

8. The Penland Watchman™ is a "good" as defined in N.C. Gen. Stat. §25-2-105.

9. Plaintiff is a "Buyer" as defined in N.C. Gen. Stat. §25-2-103(a) and a "Claimant" as defined in N.C. Gen. Stat. §99B-1(1).

10. Boston Scientific is a "Merchant" as defined in N.C. Gen. Stat. §25-2-104(1), a "Manufacturer" as defined in N.C. Gen. Stat. §99B-1(2), and a Seller as defined in N.C. Gen. Stat. §99B-1(4).

11. This is a Product Liability Action as defined in N.C. Gen. Stat. §99B-1(3).

2

12.     Plaintiff's State law claims of negligence and breach of implied warranties set forth herein are premised on the defendant's violation of Food and Drug Administration (hereinafter "FDA") regulations in that the Penland Watchman™ failed to meet FDA's premarket approval (hereinafter "PMA") requirements, including that during implantation, the device remain in the Cardiologist's control and not release from the core wire until positioning is confirmed and the deployment knob is intentionally turned counterclockwise sufficiently to unscrew the core wire from the threaded insert on the device.

## THE WATCHMAN™

13.     The Watchman™ is a Class III medical device as defined by the FDA's Center for Device and Radiological Health (CDRH). The Watchman™ device is intended to be permanently implanted in a patient's heart to seal off the left atrial appendage, a small ear-shaped pouch in the muscle wall of the left atrium (top left chamber of the heart) that is the site of almost all stroke-causing blood clots in people with atrial fibrillation (irregular, often rapid heart rate). The device is designed to act as a mesh filter, allowing blood to flow through while stopping clots.

14.     Prior to marketing the Watchman™, Boston Scientific was required to obtain premarket approval from the FDA. PMA is the process of scientific and regulatory review to evaluate the safety and effectiveness of Class III medical devices.

15.     Boston Scientific filed a PMA application for the Watchman™ on March 14, 2013. The PMA application contained, among other things, a required complete description of the device, including a description of the functional components of the device, the significant physical and performance characteristics of the device, and the principles of operation of the device.

16.     Boston Scientific knew that FDA approval is based, in part, on the specifications set forth in the PMA application and, once approved, these specifications would become FDA requirements related to the device.

17.     Boston Scientific also knew that the device would have to be manufactured and assembled in accordance with these specifications and if it failed to meet these FDA requirements, it would be considered adulterated under Section 501(F) of the Food, Drug, and Cosmetic Act, as amended by the Medical Device Amendments of 1976, and could not be marketed.

18.     Upon information believed, in its PMA application, Boston Scientific described the Watchman™ substantially as follows:

3

The WATCHMAN LAA Closure Technology consists of: (1) WATCHMAN LAA Closure Device, (2) WATCHMAN Delivery System (consisting of Delivery Catheter and loaded Implant), and (3) WATCHMAN Access System (consisting of Access Sheath and Dilator).

The WATCHMAN LAAC Device, which is constrained within the Delivery Catheter, is a self-expanding nitinol structure with a porous membrane on the proximal face and is available in five sizes. The Access System and Delivery Catheter provide femoral venous access and a means to cross into the left atrium via the interatrial septum.

The WATCHMAN LAAC Device is the implantable component of WATCHMAN LAAC Technology and is designed to be permanently implanted in the LAA. The Device is composed of: (1) A laser-cut nitinol frame that is formed to an umbrella-like shape and electropolished. Fixation anchors are located on the outer edge of the frame struts to provide stabilization in situ, (2) A heat-shaped knit permeable fabric, which is placed over the top of the Device and secured to the struts of the implant frame with sutures and to the top of the frame with a threaded insert, and (3) *A threaded insert is attached to the frame by a welded dowel pin. The threaded insert provides the mechanism for attaching the Device to the threaded core wire on the Delivery Catheter.*

The WATCHMAN Delivery System is comprised of a Delivery Catheter with a preloaded WATCHMAN Device. The Delivery Catheter is a 12 Fr reinforced catheter with a distal radiopaque marker band for in situ visualization. *A threaded core wire within the Delivery System provides the mechanism for deployment and release or recapture of the Device.* The distal section of the core wire is tapered and the entire core wire is encased within a reinforced catheter shaft; this configuration provides the rigidity necessary to deploy the Device and the flexibility to allow the Device to remain in its natural state in the LAA, without bias from the Delivery Catheter. *After the self-expanding Device is deployed and positioning is confirmed, the Device is released by turning the deployment knob counterclockwise, which unscrews the core wire from the threaded insert on the Device.*

19.     Through the specific representations in its PMA application for the Watchman™, Boston Scientific requested approval of a device that during implantation would be subject to the Cardiologist's control and not release from the core wire until positioning was confirmed and the deployment knob was intentionally turned counterclockwise sufficiently to unscrew the core wire from the threaded insert on the device.

20.     On March 13, 2015, the FDA approved Boston Scientific's premarket approval application for the Watchman™ and authorized Boston Scientific to begin manufacture and

commercial distribution of the device in accordance with approved specifications and conditions. In its approval letter, the FDA indicated it would notify the public of its decision to approve the application by making available, among other information, a summary of the safety and effectiveness data "*upon which the approval is based.*"

21.     Thereafter, the FDA posted a Summary of Safety and Effectiveness Data (SSED) on its internet homepage. The SSED includes the device specifications from Boston Scientific's PMA application set forth above.

22.     Based upon PMA, to comply with FDA requirements, during implantation the Watchman™ device must remain subject to the Cardiologist's control and not release from the core wire until positioning is confirmed and the deployment knob is intentionally turned counterclockwise sufficiently to unscrew the core wire from the threaded insert on the device.

### SUMMARY OF FACTS

23.     In February 2018, Ms. Penland was a highly robust 85-year-old with a history of paroxysmal atrial fibrillation ("Afib") and gastrointestinal bleeding related to long term use of anticoagulants. Her cardiologist, Dr. Rhyner, believed she would benefit from and was a good candidate for implantation of a Watchman™ device (hereinafter "the Procedure").

24.     On February 15, 2018, Ms. Penland was admitted to Mission Hospital and taken to the electrophysiology lab by Dr. Rhyner for the Procedure. There, pre-operative imaging was reviewed, and Ms. Penland was considered amenable for the Procedure.

25.     Ms. Penland was prepped and draped in usual sterile fashion and ultrasound was used to guide access to her right femoral vein where Dr. Rhyner introduced a 16 French short sheath. Thereafter, another sheath was delivered to the superior vena cava over a long J wire via the 16 French short sheath. Under fluoroscopic and ultrasound guidance, transseptal puncture was performed (surgical creation of small passage through the wall between the right and left atrium). Once in the left atrium, the wire was manipulated into the left superior pulmonary vein. The transseptal sheath was removed, and a Watchman™ Access Sheath (double curve) was delivered over a pig tail catheter into the distal left atrial appendage.

26.     Thereafter, Dr. Rhyner deployed a 30 mm Watchman™ device via a delivery catheter through the access sheath, but it propagated too proximally. He performed a full recapture and

removed the device and delivery catheter. This Watchman™ performed as intended and fully complied with all FDA requirements.

27.     Thereafter, Dr. Rhyner or his surgical assistant removed the Penland Watchman™ from its packaging and inspected it for damage. Seeing none, Dr. Rhyner introduced the delivery catheter into the left atrium through the access sheath.

28.     Immediately upon unsheathing the Penland Watchman™ and prior to Dr. Rhyner turning the deployment knob, it embolized free of the core wire and could be seen moving about the left atrium on fluoroscopy and transesophageal echo. The device ultimately lodged in the mitral valve with the device's barbs caught in the subvalvular apparatus.

29.     After embolization of the Penland Watchman™, Ms. Penland developed severe mitral regurgitation (back flow of blood into heart through the mitral valve). Dr. Rhyner was unable to recapture the device. He placed an intra-aortic balloon pump ("IABP") and an emergent cardiac surgery consult was called.

30.     Dr. Daniel Malloy was on call and responded. By the time he arrived, Ms. Penland was exhibiting signs of developing cardiogenic shock. Dr. Malloy decided to take her emergently to the operating room for retrieval of the device.

31.     In the operating room Dr. Malloy performed a sternotomy (surgical opening in the middle of the chest at the breastbone) and Ms. Penland was placed on cardiopulmonary bypass. Thereafter, he entered the left atrium through a standard left atriotomy (surgical opening of the atrium).

32.     Dr. Malloy observed that the device had embolized to the left ventricle and some of the device's barbs were caught in the mitral valve chordae. He was able to remove the device.

33.     Following removal of the device, Dr. Malloy noted moderate mitral regurgitation. A left atrial appendage ligation (surgical closure of the LAA) and a modified CryoMaze procedure (use of extreme cold to treat area of heart causing Afib) was performed. A transesophageal echo showed normal ventricular function and stable moderate mitral regurgitation postoperatively. Ms. Penland was on cardiopulmonary bypass for 77 minutes.

34.     Immediately following surgery, Ms. Penland remained stable on a ventilator with the IABP, but was noted to have pulmonary edema from the prior shock state.

35.     On post-operative day 4, Ms. Penland was found to have Afib with rates ranging from 54 to 66. A chest x-ray showed bilateral atelectasis/pleural effusions (accumulation of fluid in the thin membrane surrounding the lung). The following day, the Afib was more rapid with frequent pauses. Ms. Penland eventually deteriorated to asystole (cardiac arrest rhythm with no discernable electrical activity) after receiving a beta blocker. Thereafter, she was transferred to the ICU and rhythm resuscitated.

36.     On February 20, 2018, Ms. Penland was taken to the electrophysiology lab and a DDD pacemaker was placed. A chest x-ray continued to demonstrate bilateral pleural effusions.

37.     On February 22, 2018, Ms. Penland was discharged to a skilled nursing facility. Unfortunately, her condition worsened, and she was brought back to the hospital on February 27, 2018, with a symptomatic atrial flutter with a rapid ventricular response. She was also found to be in diastolic heart failure requiring diuresis. Ms. Penland ultimately underwent successful DC Cardioversion to treat her Afib and was discharged back to the skilled nursing facility on March 7, 2018.

38.     Following discharge, Ms. Penland continued to struggle with fluid accumulation and respiratory distress associated with diastolic heart failure. On March 12, 2018, she returned to Mission Hospital with increasing shortness of breath. She was found to have acute hypoxemic respiratory failure, acute congestive heart failure, and health care associated pneumonia. She was admitted to the hospital and treated with broad-spectrum antibiotics for 7 days for her pneumonia. She was also seen by cardiology and aggressively diuresed.

39.     Ms. Penland was noted to have large bilateral pleural effusions and was seen in consultation by a pulmonologist. Thoracentesis (insertion of needle into the pleural space to remove fluid) was initially performed on the right side with dramatic improvement in her oxygen demands. She also had a thoracentesis on the left side performed to further improve her pulmonary status. Ms. Penland was discharged back to the skilled nursing facility on March 22, 2018.

40.     Following discharge, Ms. Penland continued to struggle with severe respiratory distress secondary to diastolic heart failure. Unfortunately, she was never able to recover from her injuries and the open-heart surgery made necessary by the defective Penland Watchman™.

41.     On July 30, 2018, Ms. Penland died from hypoxemic respiratory failure secondary to diastolic heart failure.

7

42.    Ms. Penland's death was caused by Boston Scientific's negligence, breach of implied warranties, and violation of FDA requirements related to the Penland Watchman™. She would not have died had the Penland Watchman™ been manufactured and assembled in accordance with FDA approved specifications and otherwise performed as designed and intended, and in compliance with its FDA premarket approval.

## FIRST CLAIM FOR RELIEF
## NEGLIGENCE

43.    Plaintiff incorporates by reference all previous and subsequent paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

44.    Boston Scientific made, constructed, manufactured, assembled, inspected, packaged, sold, and distributed the Penland Watchman™.

45.    Boston Scientific had a duty under Federal law and parallel North Carolina state law to exercise reasonable care in the construction, manufacture, assembly, and inspection of the Penland Watchman™ to ensure that the device and delivery system performed to safe and acceptable standards, as designed and intended and subsequently approved by the FDA.

46.    When the Penland Watchman™ was manufactured and assembled, Boston Scientific, through its agents and employees, failed to properly seat, thread, or otherwise engage the threaded core wire on the delivery catheter into the threaded central insert on the device such that the device immediately embolized free from the core wire when it was unsheathed and prior to the Cardiologist properly positioning the device and turning the deployment knob.

47.    The Penland Watchman™ was not manufactured and/or assembled in accordance with FDA approved specifications.

48.    When the Penland Watchman™ left the Defendant's control, the threaded core wire on the delivery catheter was not properly seated, threaded, or otherwise engaged into the threaded insert on the device such that the device immediately embolized free from the core wire when it was unsheathed and prior to the Cardiologist properly positioning the device and turning the deployment knob.

49.    At the time it was sold, the Penland Watchman™ failed to meet FDA PMA requirements related to the device and was, therefore, adulterated.

8

50. Boston Scientific breached it duties to Ms. Penland and was negligent in that it:

   a. Failed to properly construct, manufacture, and/or assemble the Penland Watchman™, specifically the connection between the threaded core wire and the threaded insert on the device;

   b. Failed to construct, manufacture, and/or assemble the Penland Watchman™ so that it would perform in accordance with FDA approved specifications;

   c. Failed to properly test the Penland Watchman™ to confirm the threaded core wire was properly seated in, threaded into, or otherwise engaged with the threaded insert of the device;

   d. Failed to properly test the Penland Watchman™ to reasonably ensure that it would perform in accordance with FDA approved specifications;

   e. Failed to properly inspect the Penland Watchman™ to confirm the threaded core wire was properly seated in, threaded into, or otherwise engaged with the threaded insert on the device;

   f. Failed to properly inspect the Penland Watchman™ to reasonably ensure that it would perform in accordance with FDA approved specifications;

   g. Sold, marketed, and distributed an adulterated Class III medical device and, as a result, caused Ms. Penland's death;

   h. Sold, marketed, and distributed a Class III medical device that did not meet FDA PMA requirements and, as a result, caused Ms. Penland's death;

   i. Sold, marketed, and distributed a Class III medical device that did not meet specifications established by the FDA's PMA process and, as a result, caused Ms. Penland's death;

   j. Failed to provide reasonable and effective quality control such that the defect in the Penland Watchman™ would be discovered prior to sale or use;

   k. Sold, marketed, and distributed the defective medical device and, as a result, caused Ms. Penland's death;

   l. Sold, marketed, and distributed the Penland Watchman™ when it knew or should have known by the exercise of reasonable care that it was defective at the time of sale and did not meet FDA requirements; and

9

m. Failed to exercise reasonable care and was negligent in other ways as may be revealed through discovery and proven at trial.

51. As a direct and proximate result of Boston Scientific's negligence and violation of FDA requirements related to the Penland Watchman™, Ms. Penland suffered severe physical injuries, severe emotional distress, mental anguish, and economic loss, and ultimately died for which her Estate is entitled to compensatory damages in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00).

<u>**SECOND CLAIM FOR RELIEF**</u>
<u>**BREACH OF IMPLIED WARRANTIES**</u>

52. Plaintiff incorporates by reference all previous and subsequent paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

53. Boston Scientific made, constructed, manufactured, assembled, inspected, packaged, sold, and distributed the Penland Watchman™.

54. Boston Scientific impliedly warranted to Ms. Penland and Dr. Rhyner that the Penland Watchman™ complied with FDA premarket approval and met all PMA requirements.

55. Through its representations in its PMA application and otherwise, Boston Scientific impliedly warranted to Ms. Penland and Dr. Rhyner that during implantation, the Penland Watchman™ would remain subject to the Cardiologist's control and not release from the core wire until positioning was confirmed and the deployment knob was intentionally turned counterclockwise sufficiently to unscrew the core wire from the threaded insert on the device.

56. Boston Scientific impliedly warranted to Ms. Penland and Dr. Rhyner that the Penland Watchman™ was of merchantable quality, reasonably fit and suitable for its intended purpose, and safe for the use for which it was intended. *See* N.C. Gen. Stat. §§25-2-314; 25-2-315; 99B-1.2.

57. As a Class III medical device, to be of merchantable quality, reasonably fit and suitable for its intended purpose, and safe for the use for which it was intended, the Penland Watchman™ must perform in accordance with the specifications established by the FDA's premarket approval process, including during implantation, remaining subject to the Cardiologist's control and not release from the core wire until positioning is confirmed and the deployment knob is

intentionally turned counterclockwise sufficiently to unscrew the core wire from the threaded insert on the device. It did not.

58. At all relevant times, Ms. Penland and Dr. Rhyner used the Penland Watchman™ for the purpose and in the manner intended by Boston Scientific, but the Penland Watchman™ was not merchantable as it was not manufactured and assembled as designed and intended, and in accordance with FDA approved specifications; was not reasonably safe for its expected purpose or reasonably fit for the ordinary purpose for which it was sold and/or used; and it did not meet the expectations for the performance of the product when used in a customary, usual and reasonably foreseeable manner.

59. Within a reasonable time after the dangerous and defective condition of the Penland Watchman™ was discovered Boston Scientific was notified of the defect and breach. Boston Scientific instructed Mission Hospital to not use and dispose of any remaining devices from Lot No. 21428671.

60. Ms. Penland and/or her healthcare providers reasonably relied upon the skill and judgment of Boston Scientific and their implied warranties in using the Penland Watchman™.

61. As a direct and proximate result of Boston Scientific's breach of implied warranties, Ms. Penland suffered severe physical injuries, severe emotional distress, mental anguish, and economic loss, and ultimately died for which her Estate is entitled to compensatory damages in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00).

## DAMAGES

62. As a direct and proximate result of Boston Scientific's negligence and breach of implied warranties as alleged herein, Ms. Penland suffered a severe and irreversible injury to her heart that ultimately resulted in her premature death on July 30, 2018. Ms. Shook, as Executrix of the Estate of Jean S. Satterfield a/k/a Jean S. Penland, is entitled to recover damages as specified in N.C. Gen. Stat. §28A-18-2, for and on behalf of Ms. Penland's heirs at law, including:

    a. Expenses for the medical care, treatment, and hospitalization of Ms. Penland incident to the negligence and breach of the Defendant;

    b. All pain and suffering endured by Ms. Penland until the moment of her death;

    c. The reasonable funeral and burial expenses for Ms. Penland;

d. The present monetary value of Ms. Penland to her heirs at law, including but not limited to compensation for the loss of services, protection, care, assistance, society, companionship, comfort, guidance, kindly offices, and advice of Ms. Penland; and

e. Such other damages as may be supported by the evidence and allowed by law.

63. As a direct and proximate result of Boston Scientific's negligence and breach of implied warranties as set forth herein and in other ways as may be developed through discovery and proven at trial, the Plaintiff has been damaged and is entitled to compensatory damages for the wrongful death of Ms. Penland in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00).

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays the Court as follows:

1. That Donna S. Shook, Executrix of the Estate of Jean S. Satterfield a/k/a Jean S. Penland, have and recover of the Defendant compensatory damages for the wrongful death of Ms. Penland in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00);

2. That the costs of this action be taxed to the Defendant, including prejudgment interest from the date of the filing of this Complaint;

3. That this matter be tried before a jury; and

4. For such other and further relief as to the Court may seem just and proper.

This the 10th day of January 2021.

**HENSLEY CLONINGER, P.C.**


By: /s/ John C .Hensley, Jr.
    John C. Hensley, Jr.
    State Bar No. 16668
    366 Merrimon Avenue
    Asheville, North Carolina 28801
    Telephone: 828.225.3737
    Facsimile: 828.225.3736

    *Attorneys for Plaintiff*